821 P.2d 897 (1991)
John T. NORTON, M.D., Respondent-Appellant,
v.
COLORADO STATE BOARD OF MEDICAL EXAMINERS, comprising the following: Margaret Cary, M.D., Stewart Greisman, D.O., Gilbert Herman, M.D., Steven Katzman, and Janice J. Ugale, M.D., Complainants-Appellees.
No. 90CA2154.
Colorado Court of Appeals, Div. I.
September 12, 1991.
Rehearing Denied October 10, 1991.
Certiorari Denied January 13, 1992.
*899 Daniel R. Christopher, John R. Mann, Cooper & Kelley, P.C., Denver, for respondent-appellant.
Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Suzanne A. Fasing, First Asst. Atty. Gen., Robert A. Holden, Asst. Atty. Gen., Denver, for complainants-appellees.
Opinion by Judge DAVIDSON.
Respondent, John T. Norton, appeals a final order of the Colorado State Board of Medical Examiners (the Board) revoking his license to practice medicine. We affirm.
From 1981 to 1988, the Board received complaints against Norton, who operated a weight control clinic. After an investigation, the Board referred the complaints to the attorney general to prepare and file a formal complaint pursuant to § 12-36-118(4)(c)(IV), C.R.S. (1985 Repl. Vol. 5). The complaint was filed in April 1989 charging Norton with eight counts of grossly negligent medical practice or multiple acts of substandard care under the Colorado Medical Practice Act, § 12-36-117(1)(p), C.R.S. (1985 Repl.Vol. 5), and with unprofessional conduct pursuant to § 12-36-117(1)(h), C.R.S. (1985 Repl.Vol. 5) for violation of federal law regulating the distribution of controlled substances.
Prior to the hearing, Norton filed a motion to amend his answer to include the defense of laches. The Administrative Law Judge (ALJ) denied the motion, finding that it was too late to assert this defense. After a two-week hearing before an ALJ, Norton filed a motion to dismiss, alleging among other things, that the discovery sanction prohibiting Norton from testifying at the hearing was a denial of due process and that the investigation by the attorney general violated the Medical Practice Act and mandates dismissal of the charges.
The ALJ then issued a detailed initial decision, which included a denial of Norton's motion to dismiss, finding in pertinent part: (1) that Norton was not denied due process; and (2) that although the investigation conducted by the attorney general violated § 12-36-118(4)(c)(IV), this violation did not require dismissal of the charges or a repeat investigation as Norton was not prejudiced. The ALJ also found that Norton had committed acts of grossly negligent medical practice and substandard medical practice over a period of fifteen years, was in violation of § 12-36-117(1)(p) on each of the eight charged counts, and recommended revocation of Norton's license to practice medicine. The charges pursuant to § 12-36-117(1)(h) were dismissed and are not an issue on appeal.
*900 After this decision was reviewed by the Board, the Board then issued its final order revoking Norton's license, and this appeal followed.

I.
Norton first contends that the ALJ erred by prohibiting him from testifying for his failure to comply with discovery orders. Although he does not dispute that the ALJ otherwise had the authority to impose sanctions, see Ricci v. Davis, 627 P.2d 1111 (Colo.1981), Norton argues that the sanction violated both his right to due process and C.R.C.P. 37(d). We do not agree.
On five separate occasions during an almost ten month period, Norton failed to appear and testify at scheduled depositions. Norton was first served with a subpoena ordering him to appear in February to give a sworn statement. Norton then filed for a protective order pursuant to C.R.C.P. 26(c), requesting a continuance on the grounds that his "present health ... will not permit him to attend" on the date specified. In support of this motion, Norton attached a note written by an out-of-state doctor which stated only that "[b]ecause of medical reasons, [Norton] is advised to remain under my care until after the first week of March." At the hearing on this motion, counsel for the Board agreed to reset the taking of the sworn statement to March 9, 1989.
Norton was then served with a second subpoena issued by the Board to give a statement on this agreed upon date. Norton again filed for a protective order, one day before the scheduled date, requesting that the deposition be rescheduled on the grounds that Norton's attorneys had other matters scheduled at that time.
The record shows that the Board then issued a third notice to take Norton's deposition on August 3, 1989. Two days before the deposition was scheduled, Norton admitted himself into the hospital, and again was unavailable to be deposed. Instead, Norton's attorney appeared at the deposition with a note from the out-of-state doctor which stated that Norton was under the doctor's care and "due to the fact that [the doctor] will be on vacation until August 31, 1989, [he wanted Norton] to refrain from any stressful situations until he is evaluated... on September 1, 1989."
In response, the Board again noticed Norton's deposition for August 30. Once again, one day prior to the deposition, Norton filed a motion for a protective order on the grounds that he had not "received medical clearance from his treating physicians." The Board filed a response opposing this motion, alleging that Norton and his counsel were seeking the order to obstruct and delay the proceedings, that no showing was made as to why Norton could not be examined by a local physician prior to August 30, and that Norton had demonstrated "a pattern of bad faith and abuse of the discovery process."
After a hearing on these motions, the ALJ issued a sharply worded order criticizing the excessive number of motions which had been filed and the lack of cooperation between the parties. Regarding Norton's failure to be deposed, the ALJ stated:
"Respondent has used his health as a reason to avoid deposition for over six months. The medical evidence submitted in support of this claim is less than enlightening. There is no clear evidence that [Norton] was medically unable to be deposed in late August, and no evidence at all of his status after September 1, 1989.... The [ALJ] declines to become embroiled in another sideshow, attempting to determine whether [Norton's] health will permit him to be deposed.
. . . .
Respondent claims to be unable to be deposed since February 1989. The discovery deadline is October 20, 1989. Hearing commences on November 6, 1989. If [Norton] is unable to be deposed in the next month, it is unlikely he can be deposed before the discovery deadline. [Therefore:]
A. Norton will make himself available for ... deposition to be concluded by October 6, 1989. Scheduling problems... are not to be used as a cause for failure to comply....

*901 B. If [Norton], in consultation with his physicians, is medically unable to be deposed as ordered ... his counsel shall so notify counsel for the Board... prior to October 5, 1989. In that event, or in the event he fails to submit to a deposition for any reason, [Norton] will not be permitted to testify at hearing. It is likely that if [Norton's] medical inability to be deposed has continued from February to early October, his disability will continue into November. If this disability were to disappear between October 6 and November 6, such a belated recovery would deny the Board the opportunity for meaningful and timely discovery."
Then, two days before the October 5, deadline, Norton once again filed a notice that he would be unable to be deposed because of medical inability, contending that he could not be deposed "until sometime after [his out-of-state doctor] has had an opportunity to examine him again on October 12, 1989." Submitted with this notice was a note from the out-of-state doctor which expressed the opinion that, although Norton should be able to continue practicing medicine, Norton should not be deposed until his medical evaluation was completed in October.
The Board then filed a motion for sanctions arguing not only that Norton had failed to be deposed as ordered, but also that he had failed to comply with another discovery order issued by the ALJ. At this time, the Board requested that a default judgment be entered against Norton, or in the alternative, that Norton's license to practice medicine be suspended.
The ALJ then issued an order which denied the Board's request for sanctions, but, in accordance with the provisions of its prior order, prohibited Norton from testifying and barred him from presenting any evidence which would contradict the Board's evidence on any matter relating to the interrogatories that he had failed to answer.

A.
On appeal, Norton first contends that the ALJ's order prohibiting him from testifying violated his due process rights guaranteed by the United States and Colorado Constitutions. We do not agree.
Procedural due process requires that administrative agencies "be fundamentally fair to the individual in the resolution of a legal dispute involving governmental action that threatens to deprive an individual of a significant property interest." deKoevend v. Board of Education, 688 P.2d 219 (Colo.1984). And, a license to practice medicine is a valuable property right which is protected by due process. Prouty v. Heron, 127 Colo. 168, 255 P.2d 755 (1953).
"The essence of due process is basic fairness in procedure" deKoevend v. Board of Education, supra. In the context of any agency proceeding, this means that the respondent must receive adequate notice of the nature of the proceedings and a reasonable opportunity to be heard. Sigma Chi Fraternity v. Regents of University of Colorado, 258 F.Supp. 515 (D.Colo.1966); City & County of Denver v. Eggert, 647 P.2d 216 (Colo.1982).
In support of his argument that the discovery sanction barring him from testifying denied him due process, Norton relies on § 12-36-118(5)(e), C.R.S. (1985 Repl.Vol. 5) of the Medical Practice Act which provides that in a formal hearing before the Board: "The physician may be present in person, and by counsel if he so desires, to offer evidence and be heard in his defense." According to Norton, this statute grants the physician an absolute right to testify in his defense. And, Norton asserts, this right "cannot be defeated by a procedural rule," such as a violation of discovery orders. We disagree.
Initially, we note that the plain language of § 12-36-118(5)(e) requires only that the physician be given an opportunity to be heard in his defense, if he so chooses. It does not mandate that a physician must be allowed to testify. See Charnes v. Lobato, 743 P.2d 27 (Colo.1987).
Furthermore, due process requires only that the respondent have an opportunity *902 to be heard. It does not mandate that the respondent, in fact, be heard if he or she does not choose to take advantage of this opportunity. See Sigma Chi Fraternity v. Regents of University of Colorado, supra (due process was not violated when party was given opportunity to testify before board, but declined to do so). See also Dixon v. State Board of Optometric Examiners, 39 Colo.App. 200, 565 P.2d 960 (1977) (optometrist not denied due process when he chose not to testify at hearing).
While Norton is correct in asserting that discovery sanctions may not be imposed which violate due process, Societe Internationale pour Participations Industrielles et Commerciales, S.A. v. Rogers, 357 U.S. 197, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958), upon a review of the record, we conclude that Norton's due process rights were not violated. To the contrary, Norton was given a full and fair opportunity to testify, and he, with knowledge of the consequences, deliberately chose not to take this opportunity. On five separate occasions, he was requested to give his sworn statement to the Board, but he declined to do so. Moreover, before he failed to comply with the final order directing him to give his deposition, he was fully advised that he would be prohibited from testifying if he chose to disobey this order.
Although Norton claimed he was unable to comply because of "medical inability," the ALJ impliedly found that he had not established "good cause" for a protective order pursuant to C.R.C.P. 26(c). See Curtis, Inc. v. District Court, 186 Colo. 226, 526 P.2d 1335 (1974). Considering that Norton claimed an inability to be deposed yet continued to practice medicine, made no attempt to obtain an examination from an in-state doctor, and was able to assist his experts in preparing for trial, we find ample support in the record for the ALJ's finding.
Therefore, inasmuch as Norton was only a victim of circumstances which he created, the sanction prohibiting him from testifying did not violate his right to due process. See Sigma Chi Fraternity v. Regents of University of Colorado, supra; Walton v. Industrial Commission, 738 P.2d 66 (Colo. App.1987) (claimant was not denied due process when hearing officer entered order without her testimony when she made no effort to schedule hearing to submit her testimony); Dixon v. State Board of Optometric Examiners, supra. See also Wisconsin Real Estate Investment Trust v. Weinstein, 530 F.Supp. 1249 (E.D.Wisc. 1982) (party must appear at least four weeks before trial for deposition or will be prohibited from testifying); Medlin v. Andrew, 113 F.R.D. 650 (M.D.N.C.1987) (party seeking to avoid deposition has burden of making a specific and documented factual showing that deposition would be dangerous to health); cf. Dorsey v. Academy Moving & Storage, Inc., 423 F.2d 858 (5th Cir.1970) (discovery sanctions should not be imposed when failure to comply was a result of circumstances beyond party's control).

B.
Norton also argues that the discovery sanction violated C.R.C.P. 37(d) because (1) the ALJ, sua sponte, imposed the sanctions on Norton and (2) the ALJ did not, before imposing them, set out the factual and legal basis for the sanction as required by Kwik Way Stores, Inc. v. Caldwell, 745 P.2d 672 (Colo.1987).
Initially, we note that the ALJ's final order imposing the sanction prohibiting Norton from testifying is authorized by C.R.C.P. 37(b) which allows the impositions of sanctions after a party has failed to comply with a previous order compelling discovery. C.R.C.P. 37(d), on the other hand, deals with the imposition of sanctions against a party who has failed to respond to a discovery request, without prior entry of an order compelling discovery.
The only relevant order which is governed by C.R.C.P. 37(d) here was that which directed Norton to submit to a deposition by October 6. That order did not impose sanctions against Norton, but only specified which sanctions would be imposed if Norton failed to comply with the order. And, because the issue of whether this order complied with C.R.C.P. 37(d) was not *903 raised in the administrative proceedings, nor addressed by the ALJ or the Board, we will not consider it here. See Crocker v. Colorado Department of Revenue, 652 P.2d 1067 (Colo.1982).

II.
Norton next contends that the attorney general conducted an illegal investigation which mandates that he be given a new hearing. Specifically, Norton argues that after the inquiry panel had referred the charges to the attorney general, but prior to the filing of the formal complaint, the attorney general conducted an investigation, issued subpoenas for documents and took depositions. However, Norton asserts, because there is no specific statutory authorization for such an investigation, the attorney general violated the Medical Practice Act § 12-36-101, et seq., C.R.S. (1985 Repl.Vol. 5).
The ALJ agreed with Norton, finding that the investigation by the attorney general was in violation of § 12-36-118(4)(c)(IV). The ALJ held, however, that this violation did not require a new hearing as Norton was not prejudiced. Although the Board affirmed all of the ALJ's findings of fact, the Board concluded that the investigation by the attorney general did not violate the Medical Practice Act pursuant to People ex rel. Woodard v. Brown, 770 P.2d 1373 (Colo.App.1989). We agree with the Board.
To determine whether the Medical Practice Act authorizes the attorney general to conduct an investigation after referral of the charges but before filing the formal complaint, the statute must be read and considered as a whole. See Martinez v. Continental Enterprises, 730 P.2d 308 (Colo.1986).
As explained in People ex rel. Woodard v. Brown, supra, the Medical Practice Act provides that, for disciplinary proceedings, the Board is divided into two panels, the inquiry panel and the hearings panel. The inquiry panel is responsible for investigating complaints to determine whether formal charges are warranted. The hearings panel conducts the formal hearing and, if it finds that the charges are proven, determines the discipline to be imposed. In lieu of the hearings panel, the case can be referred to a hearing officer, such as an ALJ, for an initial decision which is then reviewed by the Board. Section 12-36-118(1), C.R.S. (1985 Repl.Vol. 5).
If the inquiry panel determines that formal charges are warranted, the complaints are referred to the attorney general to prepare and file the formal complaint pursuant to § 12-36-118(4)(c)(IV). As required by § 12-36-118(5)(a), C.R.S. (1985 Repl.Vol. 5), the complaint must "set forth the charges with sufficient particularity as to inform the physician clearly and specifically of the acts ... with which he is charged." Acting as legal counsel for the inquiry panel, the attorney general also prosecutes these charges pursuant to § 12-36-118(5)(h), C.R.S. (1985 Repl.Vol. 5).
Thus, "the attorney general is required to assist the inquiry panel in its investigative function, serve as prosecutor of charges brought by that panel," and act as legal counsel to the inquiry panel. A separate section of the attorney general's office advises the hearings panel. People ex rel. Woodard v. Brown, supra.
In addition, the Board is given broad powers pursuant to § 12-36-104(1)(b), C.R.S. (1985 Repl.Vol. 5) which authorizes the Board to:
"Make investigations, hold hearings, and take evidence in all matters relating to the exercise and performance of the powers and duties vested in the board and, in connection with any investigation (whether before or after a formal complaint is filed pursuant to section 12-36-118) or hearing and through any member, the secretary, or chief administrative officer thereof, subpoena witnesses, administer oaths and compel the testimony of witnesses and the production of books, papers, and records relevant to any inquiry or hearing." (emphasis added)
This statute authorizes the Board to issue subpoenas and make investigations, whether before or after the filing of the formal complaint. Therefore, when considering *904 the statute as a whole, we conclude that, as legal counsel for the inquiry panel, the attorney general is authorized to cause the Board to issue subpoenas and investigate the charges before the filing of the formal complaint. And, contrary to Norton's assertions, the record indicates that the attorney general caused the subpoenas here to be issued on behalf of the inquiry panel.
According to Norton, however, § 12-36-104(1)(b) must be read to carve out an exception which would effectively extinguish the powers of the Board to issue subpoenas and conduct an investigation during the period after referral of the charges to the attorney general but before the filing of the formal complaint. This interpretation, in our view, contradicts the plain language of the statute. See Pfeiffer v. Hartford Fire Insurance Co., 929 F.2d 1484 (10th Cir.1991) ("As part of preparing a complaint pursuant to the Board's referral, [the attorney general] necessarily had to investigate the incidents that would form the basis of that complaint.")
Norton further argues that because § 12-36-118(4)(a), C.R.S. (1985 Repl.Vol. 5) lists certain groups of individuals who can conduct an investigation, and does not include the attorney general, the attorney general is thus precluded from investigating the charges. Again, we disagree.
In pertinent part, § 12-36-118(4)(a) provides:
"Complaints ... relating to the conduct of any physician ... may be made by any person or may be initiated by the board.... The physician complained of shall be given notice ... [and upon] receipt of the physician's answer ... the matter shall be referred ... to the inquiry panel ... for investigation. The investigation may be made by one or more members of the inquiry panel, by one or more physicians ... by a member of the staff of the board, or by a professional investigator...."
This section, according to its plain language, is referring only to those individuals who may make an investigation for the inquiry panel prior to the referral of the charges. Norton, however, does not allege that the attorney general participated in an investigation prior to the referral of the charges to the attorney general. Therefore, this section is not relevant to Norton's allegation of error. See Pfeiffer v. Hartford Fire Insurance Co., supra.
Finally, insofar as Norton makes a general allegation that he was denied due process and prejudiced by the mere fact that the attorney general had ex parte discussions with potential witnesses, all of the transcripts taken by the attorney general were provided to Norton and, in fact, used by him for impeachment at the hearing. In addition, there was no allegation by Norton that he was prohibited from obtaining statements or depositions from these witnesses prior to the hearing. Thus, we find no prejudice. See Ricci v. Davis, supra (due process rights not infringed unless party is prejudiced by administrative procedures).
Furthermore, Norton does not refer to any authority which supports his argument that he should have been given notice of depositions taken by the attorney general. We recognize that in some instances, in which the right to privacy will be infringed by an administrative subpoena, our courts have required prior notice to the opposing party. See People v. Lopez, 776 P.2d 390 (Colo.1989). Here, however, Norton has not alleged any such infringement to his constitutional right to privacy.
Therefore, we conclude that the attorney general's investigation prior to the filing of formal charges did not violate the Medical Practice Act. See People ex rel. Woodard v. Brown, supra; see also 1 C. Koch, Administrative Law & Practice §§ 5.49, 5.50 (1985).

III.
Finally, Norton contends that the ALJ abused his discretion by denying his motion to amend his answer to include the defense of laches.
Section 12-36-118(4)(d), C.R.S. (1985 Repl.Vol. 5) of the Medical Practice Act requires that the investigation of complaints *905 by the Board "shall be expeditiously... conducted so that no physician is subjected to unfair and unjust charges." See also § 24-4-105(10), C.R.S. (1988 Repl.Vol. 10A) ("[every] agency shall proceed with reasonable dispatch to conclude any matter presented to it....").
In his answer to the original complaint filed by the Board, Norton alleged as an affirmative defense that the complaint against him must be barred because it had not been expeditiously conducted as required by § 12-36-118(4)(d).
One month after the Board filed an amended complaint against him, while retaining the allegation of undue delay in violation of § 12-36-118(4)(d), Norton moved to amend his answer to add other affirmative defenses. The ALJ allowed the amended answer, except for the affirmative defenses of age discrimination, which is not an issue here, and laches. Norton now contends that the ALJ's denial of his motion to add the defense of laches deprived him of a "legitimate defense and due process" and was, therefore, an abuse of the ALJ's discretion. We do not agree.
Laches is an affirmative defense requiring a showing of lack of diligence by plaintiff and prejudice to defendant. Roberts v. Morton, 549 F.2d 158 (10th Cir. 1976), cert. denied sub nom. Roberts v. Andrus, 434 U.S. 834, 98 S.Ct. 121, 54 L.Ed.2d 95 (1977). "The basis of laches in equity is unreasonable delay and lack of diligence extending for so long a time or under such circumstances that it would be inequitable to grant relief." O'Byrne v. Scofield, 120 Colo. 572, 212 P.2d 867 (1949).
The record here indicates that, despite its ruling on the laches defense, the ALJ consistently allowed consideration of Norton's evidence on the issue of undue delay by the Board. And, the record indicates that the ALJ did so in light of Norton's repeated reminders that he had raised the allegation that the complaint was time-barred at the inception of the case.
Moreover, the record further reveals that both the ALJ and Norton considered the equitable defense of laches as the equivalent of the statutory defense of undue delay: For example, the ALJ said: "To what extent [§ 12-36-118(4)(d)] might differ from laches, I don't know." And, Norton stated: "Although [the ALJ ruled] that we could not specifically assert the defense of laches.... We said it in the original answer [referring to § 12-36-118(4)(d)]. We just didn't use the word `laches.'"
Thus, despite Norton's allegation that he was prevented from presenting evidence to show "that the Board unreasonably delayed enforcement of the [charges] which resulted in prejudice to him," the record is to the contrary. And, the ALJ considered this evidence and specifically addressed the delay issue in his order, finding that "[all] that has been shown is the passage of time, which in and of itself, does not establish unreasonable delay ... [Norton] has demonstrated no reason why the delays in bringing this case to hearing have been prejudicial or violative of fundamental fairness."
Thus, no prejudice resulted to Norton, and accordingly, we find no abuse of discretion.
The order is affirmed.
PIERCE and MARQUEZ, JJ., concur.